IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RONALD E. MANN, <br><br> Plaintiff, <br><br> vs. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security, <br><br> Defendant. | 4:18-CV-3022 <br><br> MEMORANDUM AND ORDER |

The plaintiff, Ronald E. Mann, filed his Complaint (filing 1) seeking judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits, and moved this Court for an order reversing the Commissioner's final decision. Filing 12. The Commissioner filed her motion to affirm the agency's final decision denying benefits. Filing 18. The Court finds that the ALJ's decision is not supported by substantial evidence on the record, that the Commissioner's final decision should be reversed, and that this matter should be remanded for further proceedings.

## I. STANDARD OF REVIEW

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Id.* The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Id.*

## II. BACKGROUND

Ronald Mann is a resident of Beatrice, Nebraska. On December 14, 2011, Mann lost control of his car and collided with a tree. The collision occurred when Mann, who suffers from asthma and chronic obstructive pulmonary disease (COPD), was having trouble breathing, reached for an inhaler and lost control of his Jeep. Filing 7-10 at 33. Mann suffered a complex fracture of his pelvis (right acetabular with fragmentation), a non-displaced fracture of his right femoral head, multiple rib fractures, a nasal fracture, a concussion with a loss of consciousness, and several lacerations. Filing 7-10 at 62-83. His pelvic fracture was surgically repaired on December 15. Filing 7-10 at 78-79. At the time of the collision Mann worked for Endicott Clay Products, a brick manufacturer located in Endicott, Nebraska. Filing 7-5 at 12-13. Mann's job responsibilities included operating a tunnel kiln and preparing the clay bricks for firing in the kiln by placing them on carts. The process of firing the bricks required Mann to haul five-gallon buckets of gravel weighing around 75 pounds each up a flight of stairs and then pour the gravel down a chute.

Dr. Robert Arias evaluated Mann's concussion symptoms while he was recovering from his pelvic fracture. Filing 7-9 at 8-15. Dr. Arias concluded Mann suffered mild dysfunction consistent with what is seen after a traumatic brain injury. Filing 7-9 at 8. The dysfunction included deficits in working memory, susceptibility to interference during processing, rapid divided attention, complex visual memory retrieval, and visual reasoning skills. *Id*. Dr. Arias characterized Mann's deficits as mild and expected Mann would recover further. *Id*.

There is a report that Mann received a significant amount of physical therapy in 2012 and was discharged in May. Filing 7-7 at 11. However, no 2012 physical therapy records were included as part of the medical records

submitted in support of Mann's claim. Although not entirely clear in the evidence, it appears that Mann was not able to return to his job at Endicott. An evaluation by pulmonologist Dr. Sean Berry on May 1, 2012, reported that Mann had not returned to the brickyard because of respiratory issues. Filing 7-10 at 13. Mann indicated that after recovering from his hip fracture, he worked at Walmart as a third shift stocker so that he could build up stamina to get back into the workforce. Filing 7-2 at 41. However, Mann resigned when he concluded that he could not do the heavy lifting, kneeling, bending and reaching that the job required. *Id.* He next took a job with Setzer's Manufacturing in Beatrice. This job required Mann to operate several different sheet metal machines, which required lifting heavy metal sheets. Filing 7-2 at 42. Mann said that he had one-on-one supervision at Setzer to make sure he entered the proper codes so that everything was cut, sheared, or bent to the proper dimension. Filing 7-2 at 50.

Mann worked at Setzer until, in his words, his hip "went completely out" and he had to have it replaced. Filing 7-2 at 42. On October 14, 2013, Mann returned to see Dr. David Samani, the surgeon that repaired his hip fracture. Dr. Samani's physician assistant reported Mann was complaining of right hip pain that had gotten progressively worse over the previous three to four weeks. Filing 7-8 at 74. Axial CT images were obtained showing advanced degenerative changes in Mann's right hip, which appeared to have progressed as compared to a previous study. Filing 7-7 at 97. In a follow-up appointment on November 14, Mann received a cortisone injection to see if that would provide relief. Filing 7-8 at 72. Mann returned on November 27 reporting that he received only four days of relief from the cortisone shot. Hip replacement was recommended. Filing 7-8 at 70. On December 17, Mann underwent right total hip arthroplasty due to traumatic osteoarthritis with avascular necrosis

of the femoral head. Filing 7-7 at 70-71. In a follow-up evaluation on January 2, 2014, Mann reported that he was doing great, with only minimal pain symptoms. Filing 7-8 at 64. He was referred to physical therapy

The physical therapist reported that Mann did well in physical therapy, going from non-weightbearing and using a walker to, on March 27, 2014, when he was discharged, a normalized gait pattern on level surfaces without a device. Filing 7-7 at 44. During this same period Dr. Samani placed limits on Mann, reporting that he should avoid squatting, kneeling, crawling, running, jumping and lifting loads over 50 pounds. Filing 7-8 at 59. Following his release from physical therapy, Mann's condition appeared to worsen. At his June 23 follow-up evaluation with Dr. Samani, Mann reported increased pain. Filing 7-8 at 57-58. He said that he tried to go back to work but was unable to tolerate his pain and could only stand for about four hours. His gait was now observed to be antalgic. Dr. Samani prescribed OxyContin (*i.e.*, oxycodone) for Mann's pain symptoms and asked to see him again in two weeks. At the July 7 follow-up, Mann reported that his pain was improved, but he still had problems walking for a longer period. Mann's gait was again observed to be antalgic. Dr. Samani continued Mann's OxyContin prescription, and injected his hip with Depo-Medrol, an anti-inflammatory steroid. Filing 7-8 at 55-56.

Mann's hip pain continued into 2015. Mann's primary care physician, Dr. David Gloor, reported that on February 25, 2015, Mann was evaluated for complaints of persistent neuropathic pain in his right buttock. Filing 7-8 at 41-42. Dr. Gloor reported that Mann had been on oxycodone for a long time but had stopped because he was tired of feeling drugged all the time. Instead, Mann was trying, unsuccessfully, to control his pain symptoms with Tylenol. Dr. Gloor prescribed Neurontin (gabapentin) for Mann's neuropathic pain, and Tramadol (a narcotic-like pain reliever) for Mann's "breakthrough pain." Filing

4

7-8 at 41. In an April 14 follow-up evaluation, Mann reported that he had good improvement with Neurontin, which Dr. Gloor continued. Filing 7-9 at 4. On June 16, Mann reported that overall, he felt about the same, and that his activities were limited due to his continuing hip pain. Mann's weight, however, had climbed from around 250 pounds to 272 pounds. Dr. Gloor was now concerned about Type-2 diabetes and recommend lifestyle changes for Mann to lose weight. Filing 7-9 at 3-4.

Mann continued to regularly return to Dr. Gloor's clinic through 2015 and into the first half of 2016. Dr. Gloor's reports show that Mann's medications were continued on each visit, and that he had some success at weight loss, dropping 20 pounds. Filing 7-9 at 2-3. On July 15, 2016, Mann was examined by Dr. Gloor for complaints of left knee pain. Filing 7-9 at 2. Dr. Gloor reported that Mann's knee pain came about spontaneously without a specific new injury. Previously, Mann had surgery to repair a left knee fracture sometime around 2000. Dr. Gloor noted that Mann came into his office using a walker and was at best 25 percent toe-touch weightbearing. Mann was referred to orthopedic surgeon Dr. Douglas Koch for further evaluation. Dr. Gloor suspected that Mann would require joint replacement surgery. Filing 7-9 at 2.

Mann's appointment with Dr. Koch was July 17. Filing 7-11 at 68-69. Dr. Koch reported that Mann's pain was isolated to the medial aspect of his left knee and increased with weightbearing activities such as standing or walking. Dr. Koch discussed options with Mann including injections versus surgery. The surgery Dr. Koch discussed was total knee arthroplasty and removal of the hardware from Mann's previous knee surgery. Mann opted to try a steroid injection before agreeing to surgery. On August 29, after the steroid injection proved ineffective, Mann opted for total left knee arthroplasty. Filing 7-11 at 66-67. October evaluations by Dr. Gloor and Dr. Koch indicate that Mann's

knee replacement surgery went well, but that after a period of physical therapy, Mann continued to walk with the assistance of a cane. In his October 10 report, Dr. Koch noted that Mann was using a cane for assistance and included in his treatment plan that he was to "continue the cane as needed." Filing 7-11 at 59. In Dr. Gloor's December 19 office visit report, he noted that Mann was trying to exercise as much as possible, but that he still walked with a cane. Filing 7-9 at 19.

On January 25, 2017, Dr. Gloor completed a treating source statement specific to *Listing § 1.03 – Reconstructive Surgery or Surgical Arthrodesis of a Major Weight-Bearing Joint*. Filing 7-9 at 17-18. The first two questions on the statement asked whether Mann had "reconstructive surgery of a major weight bearing joint(s)" and whether he had "surgical arthrodesis of a major weight-bearing joint." Dr. Gloor answered both questions "Rt hip 2013 Lt knee 2016." Question three inquired: "Concerning your patient's ability to 'ambulate effectively,' is your patient able to do the following on a *sustained* basis *without companion assistance*." Four separate subparts followed inquiring about the patient's ability to walk on rough or uneven surfaces, use public transportation, carry out routine tasks such as shopping, and climb stairs. Next to each subpart were boxes to be checked either yes or no. Dr. Gloor did not check any of the subpart boxes. Question 4 requested a response if any of the "sub questions under question 3" were checked "no." Dr. Gloor also did not respond to question 4.

Instead, under question 4 were blank lines asking the evaluator to "*Explain, if necessary*." Dr. Gloor provided the following explanation: "Ron walks with aid of a cane. He often limps from his right hip. I cannot quantify specific functional use." There was no question 5. Question 6 inquired: "Does

6

your patient need an assistive device to ambulate?" Dr. Gloor checked the "yes" box and explained that the assistive device Mann needed was a cane.

Mann filed his application for disability insurance benefits on July 9, 2014, alleging that December 17, 2013 was the date he became unable to work because of his disabling condition. Filing 7-5 at 2. His application was initially denied on January 6, 2015, and upon reconsideration, was denied again on May 15, 2015. The ALJ held a hearing on Mann's application on February 24, 2017. Filing 7-2 at 34. The hearing was by teleconference with the ALJ in Fargo, North Dakota, Mann and his counsel in Lincoln, and a vocational expert appearing by telephone. Filing 7-2 at 16. Mann testified that he was 53 years old, 5'9" tall, and weighed 250 pounds. He was married and had one adult child who was out of the house. Mann said that he had a current driver's license but did not drive a lot due to the "narcotic pain medication" he was taking. He said that he left school during the middle part of the 12th grade and went into the Marine Corps.

After testifying about his past work experience, Mann described his various injuries, and surgical procedures. In response to his counsel's question, Mann said that he "always walks with a cane" and had done so "ever since my original accident due to the nerve damage in the hip. Sometimes the hip goes out." Filing 7-2 at 47. Mann said that he had been on pain killers since the time of the traffic accident. He identified side effects he experienced from his pain medication such as drowsiness, sleepiness, and the inability to operate machinery or drive. Filing 7-2 at 47, 53.

Mann said that he had trouble with short-term memory, remembering directions, and numbers. He indicated that he tended to get numbers mixed up and needed help managing money. Filing 7-2 at 47-48. Mann testified that he had to have his cell phone number written down because he could not recall it.

7

He said he could not recall what day of the week it was without help, and that his wife had to make sure he took all his medications because he would forget. Filing 7-2 at 50. Mann's daily medication requirements included prescription and non-prescription medications to treat COPD, asthma, hypertension, depression, glaucoma, macular degeneration, type-2 diabetes, high cholesterol, and cluster headaches, in addition to the medications he was taking for neuropathic and breakthrough pain.

Mann testified that he could only stand for ten to fifteen minutes at a time because it put too much pressure on his hip. Filing 7-2 at 53-54. He said that he could no longer descend steps normally with one foot in front of the other, and that he now needed handrails on both sides for assistance. Filing 7-2 at 49. Mann testified that he could care for his personal hygiene, but that at times he needed help getting in the shower. Filing 7-2 at 54. He said he could hand-wash dishes and make simple meals in the microwave. But his wife would not let him use the oven because he forgets to turn it off. Mann testified that he could vacuum for short periods of time. He said that during the course of a day he would watch television or read off and on, but would get headaches if he did either for too long.

The ALJ proposed the following hypothetical for the vocational expert to consider regarding Mann's residual functional capacity.

> Please assume a hypothetical individual who is – or who has the same age, education, and work experience as the claimant, and this hypothetical individual would be able to lift and or carry 20 pounds occasionally and ten pounds frequently; stand and or walk for about six hours in an eight-hour day and sit for about six. This person could occasionally climb ramps or stairs, ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; should

avoid concentrated exposure to both extreme cold and extreme heat as well as excessive noise, excessive vibration, and exposure to irritants such as fumes, odors, dust, gases, poorly ventilated areas. Person would be limited to simple, routine, and repetitive tasks and could only handle occasional changes in the work setting.

Filing 7-2 at 57-58.

The vocational expert testified that the hypothetical individual would not be able to return to Mann's past work, but that there would be other work available for such person in the national economy. She identified three job titles in the unskilled (SVP 2), light exertional category; a palletizer, a router, and a folding machine operator. The ALJ then had the vocational expert consider the same hypothetical individual limited to the sedentary exertional category and asked whether such individual would have transferable skills. The vocational expert said no. Mann's counsel inquired: if the hypothetical individual in the light exertional category needed more than ordinary supervision, would he be able to perform the jobs she identified. The vocational expert said such person would be precluded from competitive employment.

The ALJ issued an unfavorable decision on May 4, 2017. Filing 7-2 at 13-28. The ALJ analyzed Mann's disability by following the five-step sequential evaluation process outlined in 20 C.F.R. § 420.1520(a)-(f).[1] Consistent with

---

[1] To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At step one, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013). If the claimant has engaged in substantial gainful activity, he will be found not to be disabled; otherwise, at step two, he has the burden to prove he has a medically determinable physical or mental

Mann's application, the ALJ found that he met the insured status requirements of the Act and that he had not engaged in substantial gainful activity since December 17, 2013. Filing 7-2 at 18. The ALJ found that Mann had several severe impairments; history of right hip injury with total arthroplasty right hip, left knee osteoarthritis with total left knee replacement, COPD, asthma, history of migraine headaches, obesity, and traumatic brain injury with residual neurocognitive disorder. The ALJ also identified several non-severe conditions; hypertension, diabetes mellitus, macular degeneration, obstructive sleep apnea and posttraumatic stress disorder. The ALJ found that Mann's impairments or combination of impairments did not meet the criteria of a presumptively disabling impairment listed in the regulations.

The ALJ found that Mann had a residual functional capacity to perform light work consistent with the hypothetical he posed to the vocational expert. Filing 7-2 at 21. The ALJ concluded that Mann was unable to return to past relevant work which generally required a functional capacity in the medium to

---

impairment or combination of impairments that significantly limits his physical or mental ability to perform basic work activities. *Id*. At step three, if the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, he is automatically found disabled and is entitled to benefits. *Id*. Otherwise, the analysis proceeds to step four. But first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what he can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). At step four, the claimant has the burden to prove he lacks the RFC to perform his past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his past relevant work, he will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id*.; *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

very heavy physical demand range. Filing 7-2 at 26. However, considering Mann's age, education, transferable skills, and capacity to perform light physical demand work, the ALJ found that Mann was not disabled, in that there were jobs that exist in significant numbers in the national economy that Mann could perform. The Appeals Council denied Mann's request for review, thereby making the ALJ's decision the Commissioner's final decision under 42 U.S.C. § 405(g). Filing 7-2 at 2.

## III. DISCUSSION

### 1. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE DECISION.

"Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2015). "The ALJ may not simply draw his own inferences about plaintiff's functional ability from medical reports." *Combs*, 878 F.3d at 646.

The ALJ concluded that although Mann's medically determinable impairments could reasonably be expected to produce the symptoms Mann described, the intensity, persistence and limiting effects of the symptoms was "not entirely consistent with the medical evidence and other evidence" in the record. Filing 7-2 at 22. The medical evidence that the ALJ focused on were the reports from the two medical consultants that reviewed a limited portion of Mann's medical file to opine that he retained the capacity for light work, and the physical therapy records indicating that Mann was "released with a good prognosis." Filing 7-2 at 23 & 25.

However, the two consultants and physical therapy reports either ignored, failed to consider, or were unaware of the many reports from Mann's treating orthopedic surgeon and primary care physician regarding the pain

11

and dysfunction that Mann continued to experience with his right hip condition. In fact, none of the sources the ALJ relied on considered the impairment and disability resulting from Mann's left knee arthroplasty. Mann was released from physical therapy in March 2014, and the two consultant reports are dated January and May of 2015. However, reports of Mann's left knee dysfunction did not come about until July 2016. Mann argues, and the medical records reflect, that after July 2016, Mann required greater assistance with ambulation.

The record as a whole reflects that the ALJ did not accurately or fairly consider the reports from Mann's treating doctors that indicate a steady worsening of his condition after his release from physical therapy on March 27, 2014. On June 23, 2014, Mann's hip pain was such that he returned to see Dr. Samani who observed that Mann's gait was antalgic. Dr. Samani also prescribed OxyContin to address Mann's increasing pain symptoms. The ALJ described this office visit as Mann "exhibited some ongoing discomfort." That description is not accurate. Dr. Samani specifically observed physical dysfunction in Mann's gait. Also, it goes without saying that prescribing an addictive narcotic such as OxyContin is not something an orthopedic surgeon does simply because the patient is exhibiting "some discomfort." When Mann returned to Dr. Samani in July, the OxyContin prescription was renewed, and Mann received a steroid injection into his hip. Again, this is not treatment that an orthopedic surgeon provides merely because a patient is experiencing "some discomfort."

When the treatment of Mann's pain symptoms with OxyContin became problematic because it caused him to feel drugged, Dr. Gloor—Mann's primary care physician—prescribed a combination of Neurontin for neuropathic pain and Tramadol for breakthrough pain. Mann was still being treated with these

prescription medications in 2017 at the time of his hearing. The ALJ described Dr. Gloor's involvement as "minimal treatment with medication." The ALJ's description fails to acknowledge that prescription pain medications are not "minimal treatments" and fails to acknowledge that the continuous need for prescription medication over a two-year period is not "minimal treatment."

An ALJ is required to give controlling weight to the opinions of treating doctors when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Toland v. Colvin,* 761 F.3d 931, 935 (8th Cir. 2014). The opinions of Mann's treating doctors that the ALJ minimized (or did not consider) were conclusions the doctors made in real-time for the purposes of treatment. Those kinds of opinions are particularly controlling and should be given the greatest degree of weight. Not only are those opinions well-supported by the medical evidence, they *are* the medical evidence.

In addition, the medical treatment records provide substantial evidence of Mann's continuing inability to ambulate effectively that the ALJ may not disregard or ignore. On July 15, 2016, Dr. Gloor reported that Mann was using a walker and was at best 25 percent toe-touch weightbearing. Dr. Gloor referred Mann to Dr. Koch, who on October 10, 2016, reported that Mann was using a cane for assistance. Moreover, Dr. Koch's treatment plan provided that Mann should continue the cane as needed. Filing 7-11 at 59. Mann was still using a cane for assistance in December, as noted by Dr. Gloor in his December 19 office visit report. Finally, Mann was walking with a cane on the day of his hearing, February 24, 2017. There is no medical report or opinion in the record indicating that after his left knee arthroplasty Mann did not need to use a cane for ambulation or that his current need for a cane was not expected to last for twelve months. *See Barnhart v. Wilson,* 535 U.S. 212, 214-15 (2002).

13

In support of his view that Mann does not require a cane, the ALJ cites to Dr. Koch's report that Mann had decreased left knee flexion but otherwise normal findings, and that no doctor prescribed a cane for Mann. A cane, unlike OxyContin, can be obtained without a physician's prescription. Thus, whether or not a cane was formally prescribed, there is substantial evidence in the record that Mann required the use of a cane, and that the use of a cane, as needed, was ordered by Dr. Koch as part of Mann's treatment plan. The ALJ's conclusion that Mann's left knee flexion was decreased, but otherwise normal, does not address whether he required the assistance of a cane to effectively ambulate due to increase hip pain. The ALJ may not draw his own inferences about Mann's functional ability from the medical reports. *Combs*, 878 F.3d at 646. A comment in a medical record that a claimant was doing well for the purposes of treatment "has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity." *Nowling v. Colvin,* 813 F.3d 1110, 1123 (8th Cir. 2016).

The only medical report that specifically addressed Mann's function with respect to ambulation was Dr. Gloor's response to the state agency's pre-printed form. However, the ALJ gave minimal weight to Dr. Gloor's responses because he "did not specify any work-related limitations related to cane use." Filing 7-2 at 25. But the form did not request specification of work-related limitations related to cane use. Instead, the form requested a yes or no response to further descriptions of the patient's ability to ambulate effectively on a sustained basis without companion assistance. Dr. Gloor ignored the yes/no response and explained that "Ron walks with aid of a cane. He often limps from his right hip. I cannot quantify specific functional use." Thus, when the form asked whether Mann is able to "walk a block at a reasonable pace on rough or uneven surfaces," Dr. Gloor's answer must be understood to be "he

can, but with the use of a cane." If quantifying Mann's specific function was important, the ALJ should have supplemented the record consistent with his duty to fully and fairly develop the record. *Combs*, 878 F.3d at 646. The ALJ was not free to infer from Dr. Gloor's responses on the form that Mann did not require the use of a cane. To the contrary, when the form specifically asked if Mann needed an assistive devise to ambulate, Dr. Gloor checked the "yes" box and identified that the device needed was a cane.

The ALJ's failure to include a statement about the use of a cane or assistive device for ambulation in the hypothetical posed to the vocational expert was error. "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical." *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005). Hypothetical questions must include "all the claimant's impairments supported by substantial evidence in the record as a whole." *Id.*; *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006).

There is substantial evidence in the record as a whole that Mann currently can only effectively ambulate with the use of a cane. Additionally, there is substantial evidence in the record as a whole that Mann continues to require prescription pain medication to treat his pain symptoms. Many employers require job applicants to undergo drug testing, and pain killers are just one of the many drugs that the employer is looking for. Certainly, employers do not want employees operating machinery under the influence of narcotic medications. However, the ALJ did not include anything in his hypothetical about the continuing need for prescription pain medications. Neither did the hypothetical reference Mann's obvious obesity.

The ALJ was required to include all of Mann's impairments in a hypothetical. He did not, and as such, this matter should be remanded to

15

determine Mann's residual functional capacity and whether there are jobs that exist in significant numbers in the national economy that Mann could perform considering all of Mann's impairments and disabilities.

Upon remand, the ALJ should consider whether there is substantial evidence supporting the two consulting physician opinions that Mann retains the capacity to stand or walk for six hours in an eight-hour day, can occasionally climb ramps or stairs, ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. The consulting physicians who offered these conclusions were unaware of Mann's left knee arthroplasty and the level of dysfunction that Mann experienced thereafter. In addition to considering whether Mann continues to require assistance with ambulation, consideration must also be given to Mann's obesity, which the ALJ's hypothetical ignored. Finally, the ALJ must address whether Mann continues to require pain medication and the effect that may have on his ability to engage in competitive employment. It may well be that the record in this matter needs to be further developed. "[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Combs*, 878 F.3d at 646.

Regarding his traumatic brain injury, Mann argues that the ALJ's hypothetical did not accurately identify Mann's cognitive impairments and the limitations resulting therefrom. In pertinent part, the hypothetical provided that such person "would be limited to simple, routine, and repetitive tasks and could only handle occasional changed in the work setting." Filing 7-2 at 58.

The State referred Mann to psychologist Dr. Leland Zlomke for an assessment, which was performed on May 4, 2015. Dr. Zlomke's report found Mann to have average cognitive ability, with recent and intermediate memory mild to moderately impaired. Filing 7-8 at 51. Dr. Zlomke concluded that

16

Mann's recall after 20 minutes was poor, and that he would require a higher level of supervision until very familiar with his expected activities. Based on Mann's self-reports, Dr. Zlomke believed that he had difficulty accepting changes. The State agency had another psychologist review Mann's file, including Dr. Zlomke's assessment. That psychologist essentially adopted Dr. Zlomke's findings and conclusions. Filing 7-3 at 26-27.

The ALJ reported that he gave great weight to the State agency consultant's conclusion that Mann would require simple and uncomplicated instructions because it was consistent with the finding of mild to moderate memory impairment. Filing 7-2 at 25-26. But the ALJ stated that he gave little weight to everything else. Specifically, the ALJ gave little weight to Dr. Zlomke's opinion that Mann would require "a moderate to higher level of additional supervision until he is very familiar with expected activities." Filing 7-2 at 25.

Dr. Zlomke, however, was not alone in his assessment that Mann would require additional supervision, at least initially. The State agency consultant similarly opined that Mann "might possibly need more-than-ordinary supervision to assist in learning new tasks." Filing 7-3 at 26. The only basis the ALJ gave for rejecting the conclusions of both experts was his view that the opinions are inconsistent with the finding of mild to moderate memory impairment. However, an ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports." *Combs*, 878 F.3d at 646.

The ALJ's hypothetical failed to include a conclusion that both mental health experts included in their reports: that Mann either would or may require additional supervision learning new tasks. Hypothetical questions must include "all the claimant's impairments supported by substantial evidence in the record as a whole." *Grissom*, 416 F.3d at 837.

17

On remand, the ALJ should determine whether the record needs to be further developed regarding Mann's cognitive function. Both experts evaluated Mann in 2015, prior to his left knee arthroplasty and his consistent need for pain medication. If no further development is required, the ALJ should reconsider his hypothetical regarding cognitive function and include all impairments identified by the experts supported by substantial evidence.

## 2. APPOINTMENTS CLAUSE.

Mann raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC,* 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner.[2] Consistent with *Lucia,* Mann asks that this matter be remanded and that a different ALJ be assigned to determine his claim for benefits.[3] In response, the Commissioner does not dispute (but also does not concede) that Social Security ALJs are inferior officers as opposed to agency employees. Instead, the Commissioner argues that Mann waived any claim pursuant to the Appointments Clause by not timely raising the issue at the hearing before the ALJ or to the Appeals Council.

---

[2] The Appointments Clause provides, in pertinent part, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II § 2, cl. 2.

[3] In *Lucia,* the matter was remanded for a new hearing before a different fact-finder. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Lucia,* 138 S. Ct. at 2055.

Appointments Clause challenges are deemed to be "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.*, 501 U.S. 868, 879-80 (1991). On remand, Mann may raise a challenge to the ALJ's appointment if he so elects. It will be up to the Commissioner whether to have the previous ALJ preside, or whether it would be prudent to assign a different ALJ and avoid any later challenge that may arise pursuant to *Lucia*.

## IV. CONCLUSION

There is not substantial evidence on the record as a whole supporting the ALJ's denial of benefits. This matter must be remanded for reconsideration consistent with this Memorandum and Order.

IT IS ORDERED:

1. Mann's motion for reversal of the Commissioner's final decision is granted.

2. The Commissioner's motion to affirm the Commissioner's final decision is denied.

3. The Commissioner's decision is reversed.

4. This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Court's Memorandum and Order.

5. A separate judgment will be entered.

Dated this 6th day of December, 2018.

BY THE COURT:

_John M. Gerrard_
John M. Gerrard
Chief United States District Judge